UNITED STATES of America,
Plaintiff-Appellee,

v.

Clyde Major THOMPSON, aka Clyde
Johnson; Defendant-Appellant.

No. 86–5195.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 7, 1987.

Decided Sept. 10, 1987.

motion for attorneys' fees is denied.

Judith S. Feigin, San Diego, Cal., for plaintiff-appellee.

Mario G. Conte and Verna J. Wefald, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendant-appellant.

Before SNEED, KOZINSKI and THOMPSON, Circuit Judges.

KOZINSKI, Circuit Judge:

In this case we must answer some of the questions left open by the Supreme Court in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The most important of these is whether the district judge abused his discretion by conducting an in camera, ex parte examination of the prosecutor's motives for excluding blacks from the jury.

### Facts

On July 1, 1985, two employees of Security Pacific National Bank in San Diego left the branch where they worked and crossed the street. It was early in the morning and the two were following their daily routine of servicing Security Pacific's Automatic Teller Machines (ATMs) that dispense cash and perform other banking functions. The machines, together with a nearby safe, usually held well over $100,000.

The bank employees had just begun closing down the machines, when one of them sensed someone standing behind him. He turned and saw a man who proved to be defendant Thompson. The employee said, "Sir, I'm sorry, this machine is closed. Please use the machine around the corner." Defendant responded to this courtesy by putting a gun to the employee's head and shoving him inside the building where the ATMs were housed. After much screaming and verbal abuse, the defendant and an accomplice left, taking with them $136,000 in twenty-dollar bills.

Right about that time, Thompson began to spend freely. Between the robbery and his arrest he bought a van (almost entirely with twenty-dollar bills), insurance, clothing and remote control helicopters. He was also generous with his friends and relatives. Indeed, by the time police finally caught up with him, he had only $6500 left. Thompson was then arrested and read his rights. He made a full confession, the voluntariness and accuracy of which he does not challenge.

At trial, Thompson's lawyer opened his argument by conceding: "Clyde Thompson confessed to this bank robbery, and I'm here to tell you, yes, he did it." The jury agreed, and returned a guilty verdict, apparently rejecting Thompson's claim that, but for the active solicitation of a former bank employee, he never would have robbed the bank.

### Issue

Thompson's trial began on December 12, 1985, with the selection of a jury. In keep-

ing with the custom of the federal courts, the judge alone conducted voir dire; each side was then given a number of peremptory challenges. This appeal was taken because Thompson is black and the government used four of its peremptory challenges to exclude all four blacks in the venire. Immediately after the jury was sworn, Thompson's lawyer moved for a mistrial. The court allowed the government to put its reasons for the disputed peremptory challenges on the record, albeit in camera and out of the presence of the defendant and his lawyer. After hearing out the prosecutor, the court denied the motion for mistrial, and the case proceeded. The defendant did not learn what the prosecutor had said until he received a transcript in preparation for this appeal. Relevant portions are set out in the margin.[1]

The defendant argues that this procedure violated his fifth amendment right to due process and his sixth amendment right to a fair and impartial jury. He also contends that his conviction must be reversed even if this procedure did not violate his rights, because the transcript reveals that the prosecution used its peremptory challenges in a racially discriminatory way. The government disputes each of these points but argues that, even if we accept their validity, they amount to no more than harmless error.

### Discussion

It has been established for over a century that a "State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 1716, 90 L.Ed.2d 69 (1986) (citing *Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 25 L.Ed. 664 (1880)). Until recently, however, proof that a prosecutor peremptorily challenged all blacks on a particular venire was insufficient to show purposeful exclusion. Under *Swain v. Alabama*, 380 U.S. 202, 227, 85 S.Ct. 824, 839, 13 L.Ed.2d 759 (1965), a defendant wishing to raise the issue had to show that a prosecutor used peremptory challenges systematically, over some period of time, to exclude blacks from juries. *Swain* was still good law at the time of Thompson's trial and, the defense having made no such showing, we cannot fault the district judge for denying a mistrial. Indeed, he showed remarkable prescience in asking the prosecutor to state her reasons at all.

Since the trial, however, *Swain* has been overruled, *Batson*, 106 S.Ct. at 1725 n. 25; and *Batson* has since been held retroactively applicable to all cases, like this one, pending on direct appeal, *Griffith v. Kentucky*, —— U.S. ——, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987). We must, therefore, carefully review and apply *Batson*'s teachings to Thompson's case.

*Batson* allows a defendant to overcome what *Swain* called the "presumption in any particular case ... that the prosecutor is using the State's challenges to obtain a fair and impartial jury...." *Swain*, 380 U.S. at 222, 85 S.Ct. at 837. To do this, a defendant must first show that "he is a

---

1. THE COURT: Let the record show we're *in camera* outside the presence of defense counsel.

    Ms. Feigin?

    MS. FEIGIN: Your Honor, the juror [sic] Mr. Conte [the defendant's lawyer] is referring to, Cynthia King and Annie McMullen, Marvin Young and Carlos Davis....

    My reasons [sic] for excluding Cynthia King is she is a social worker. I just wouldn't put a social worker on the jury.

    Annie McMullen looked—she glared at me. She looked really sullen, and she just, I mean it was like a glare. I felt very uncomfortable with her, and I wouldn't put her on.

    Marvin Young lives in the defendant's neighborhood. He came to court in jeans, and I just thought—I felt uncomfortable. I don't like to pick people who come in in jeans, in the first place, because I think it shows that they don't have that much respect for the system, kind of treating very casually—usually with people that are a little more dressed in a manner that to me would indicate they took it more seriously. I thought he lived in the neighborhood—he's black, too, and he was dressed casually, and I thought he might identify with him too much so I excused him.

    Carlos Davis I kicked because he acquitted in a case just a couple of weeks ago.

    Reporter's Transcript, vol. I, pp. 168–69 (Dec. 12, 1985).

member of a cognizable racial group." *Batson*, 106 S.Ct. at 1723. Then he must show circumstances that raise a necessary inference of purposeful discrimination, for example, a pattern of striking veniremen of the defendant's race, or the prosecutor's comments during voir dire. *Id.*

If the defendant can make these two showings, he establishes a prima facie case and the burden then shifts to the prosecutor to present a neutral explanation for his challenges. The prosecutor may not rely on assumptions or intuition that a challenged juror would be partial to the defendant because he is of the same race, nor may the prosecutor simply rely on an assertion of good faith. He "must articulate a neutral explanation related to the particular case to be tried." *Id.* The Supreme Court did not say, however, when a defendant must raise his objection nor what procedures the court must follow after a defendant objects. *Id.* at 1724.

### A. Timeliness of Objection

■ The government argues that defendant's objection came too late on two separate accounts. First, it claims that because defendant did not base his argument on the equal protection clause until appeal, his conviction can be reversed only if manifest injustice would result. It is true that at trial Thompson objected to the exclusion of blacks from the jury only on sixth amendment grounds.[2] But at least Thompson raises the equal protection argument now, which is more than Batson did. *See Batson*, 106 S.Ct. at 1729 (Stevens, J., concurring); *id.* at 1732 (Burger, C.J., dissenting). Moreover, Thompson informed the district court and opposing counsel of the precise nature of his objections, including those pertaining to the district court's method of probing the prosecution's motives. Only his legal theory is different on appeal. Because the law was in a state of flux at the time of trial, and because the prosecution has shown no prejudice, we conclude that Thompson may raise his equal protection claim on this appeal without the need to show manifest injustice.

The government also argues that Thompson's objection came too late because he did not raise it until just after the jury was sworn. We are unpersuaded. The pattern of the prosecution's peremptory challenges might not have been apparent until the jury was selected, so the objection could not, in any case, have been raised much earlier. While it may have been the better practice to raise the objection just after the jury was selected but before it was sworn, the government suffered no prejudice from the delay. Since it was Thompson who moved for a mistrial, double jeopardy would not have barred a new trial. *See United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971).

### B. Ex Parte Procedures

The government concedes that Thompson made out a prima facie case under *Batson*, shifting to it the burden to articulate the reasons for its peremptory challenges. The question presented to us is therefore a narrow one: whether the district judge erred by permitting the Assistant United States Attorney to state her reasons to him ex parte and then ruling on the objection without divulging the reasons to defense counsel. In resolving this issue we must consider and reconcile two fundamental principles of our criminal justice system. The first is that the district judge has broad discretion to fashion and guide the procedures to be followed in cases before him. *See, e.g., United States v. Toomey*, 764 F.2d 678, 682 (9th Cir.1985) (district judge has considerable discretion in voir dire), *cert. denied*, 474 U.S. 1069, 106 S.Ct. 828, 88 L.Ed.2d 799 (1986); *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir.1986) (district judge has discretion whether to hold a hearing on motion to suppress). The second principle is that adversary proceedings are the norm in our system of criminal justice, *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985), and ex parte proceedings the disfavored exception.

---

**2.** The sixth amendment's requirement of a jury selected from a fair cross section of the community applies only to the selection of the venire and not the petit jury. *See Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 1764–65, 90 L.Ed.2d 137 (1986).

We start with the first of these propositions. Wisdom and experience teach us that district judges must have the broadest latitude in presiding over the cases before them. District judges are on the scene and can consider and weigh competing interests with much greater precision than appellate judges, who must rely on a cold and often incomplete record. Moreover, district judges are able to consider matters that may be unique to particular fact situations and tailor procedures to serve the ends of justice in the many cases that come before them. And, they must often make these decisions quickly, yet with finality, lest the litigation process become stalled in procedural disputes. By and large, therefore, appellate courts should defer to the procedures selected by district judges.

■ But this deference is not without limits. A district judge may not adopt procedures that impair a defendant's right to due process or his other rights guaranteed by the constitution. *See, e.g., Franks v. Delaware,* 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978) (evidentiary hearing required on motion to suppress if defendant's position sufficiently definite, detailed, and nonconjectural); *United States v. Licavoli,* 604 F.2d 613, 621 (9th Cir.1979) (same), *cert. denied,* 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980). Even in civil cases, the district court may not adopt procedures that tend to significantly favor one party over the other. *See Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242–43, 100 S.Ct. 1610, 1613–14, 64 L.Ed.2d 182 (1980).

■ The right of a criminal defendant to an adversary proceeding is fundamental to our system of justice. *See Nix v. Williams,* 467 U.S. 431, 454–55, 104 S.Ct. 2501, 2514–15, 81 L.Ed.2d 377 (1984) (Stevens, J., concurring in the judgment); *see also Pointer v. Texas,* 380 U.S. 400, 404–05, 85 S.Ct. 1065, 1068–69, 13 L.Ed.2d 923 (1965) (discussing right of confrontation and cross-examination). This includes the right to be personally present and to be represented by counsel at critical stages during the course of the prosecution. *United States v. Wade,* 388 U.S. 218, 224–25, 87 S.Ct. 1926, 1930–31, 18 L.Ed.2d 1149 (1967). This is not mere idle formalism. Our system is grounded on the notion that truth will most likely be served if the decisionmaker—judge or jury—has the benefit of forceful argument by both sides. *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975). Inquisitorial proceedings, where the judge takes an active role in ferreting out the truth, may be the rule elsewhere in the world, but they are decidedly alien to our way of thinking. Our judges usually have neither the time, nor the means, nor the training to investigate facts pertaining to the cases before them. Even on matters of law, our judges must rely heavily on counsel to come up with the arguments and citations supporting their respective positions.

There are, to be sure, occasional departures from this norm. The district judge makes an ex parte review of the prosecution's evidence to determine whether it falls within the rule of *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). *See United States v. Dupuy,* 760 F.2d 1492, 1501 (9th Cir.1985) (in camera review of plea bargain notes); *United States v. Hsieh Hui Mei Chen,* 754 F.2d 817, 824 (9th Cir.) (in camera review of Border Patrol report), *cert. denied,* 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985). Also, the district judge normally considers on an ex parte basis whether to reveal to the defense the identity of a government informant. *See, e.g., United States v. McLaughlin,* 525 F.2d 517, 519 (9th Cir.1975), *cert. denied,* 427 U.S. 904, 96 S.Ct. 3190, 49 L.Ed.2d 1198 (1976). But, as these examples illustrate, situations where the court acts with the benefit of only one side's presentation are uneasy compromises with some overriding necessity, such as the need to act quickly [3] or to keep sensitive information from the opposing party. Absent such compelling justification, ex parte proceedings are anathema

---

**3.** Proceedings involving some applications for temporary restraining orders are of this nature. *See* Fed.R.Civ.P. 65(b).

in our system of justice and, in the context of a criminal trial, may amount to a denial of due process.

■ The government offers three separate, but related, justifications for the ex parte procedure employed in this case. First, it argues that an adversary hearing is inappropriate because the government lawyer is required to reveal confidential matters of tactics and strategy, potentially impairing his ability to prosecute the case. In effect, the government argues, adversary hearings would seriously impair the prosecutor's use of peremptory challenges because they might lead to disclosure of his case strategy to opposing counsel. Second, the government argues, adversary proceedings, potentially involving evidentiary hearings and questioning of the government's counsel, would be far too burdensome and disruptive. Finally, the government relies on a recent decision of the Sixth Circuit, *United States v. Davis*, 809 F.2d 1194 (6th Cir.), *cert. denied,* —— U.S. ——, ——, 107 S.Ct. 3234, 3235, 97 L.Ed.2d 740 (1987), for the proposition that, once the defense has identified a potential *Batson* violation, its "participation [is] no longer necessary for the district court to make its determination." *Id.* at 1202. We give each of these arguments careful consideration.

*1.* The government's first argument is, in our view, the weightiest. The potential for release of confidential information, prejudicing the prosecution's ability to conduct its case, is precisely the type of concern that has justified ex parte proceedings in other situations. *See* p. 1258 *supra.* But it is not a concern that can be considered in the abstract, nor is it necessarily relevant in all cases. It is certainly possible that in a particular case the prosecution's motive for excluding potential jurors will grow out of its case strategy, and divulging those reasons to opposing counsel could cause it severe prejudice. However, the prosecution's reasons may be much more mundane, as they were in this case: the potential jurors' profession, attitude, dress, address and the fact that one had acquitted in a prior case. *See* n. 1 *supra.* Disclosure of these reasons to opposing counsel could not conceivably have prejudiced the prosecution. It was there-fore not an appropriate or sufficient justification for resorting to ex parte proceedings in *this* case.

Nor are we persuaded by the government's more general argument that having to disclose its reasons to opposing counsel would, in itself, deter it from fully exercising its peremptory challenges. Where a prosecutor claims that his reasons relate to case strategy, the district judge can consider those reasons on an ex parte basis, at least initially, much as in situations involving *Brady* materials or the identity of informants. But where the prosecutor's reasons are not strategy-related, having to disclose them to opposing counsel cannot jeopardize the prosecution's case and therefore cannot serve as a deterrent to the exercise of peremptory challenges. Of course, the need to make any disclosure at all is a deterrent of sorts; prosecutors may act on instinct or for reasons that are legitimate yet difficult to articulate. But that is a burden that the Court specifically said they must bear. *See Batson,* 106 S.Ct. at 1723.

*2.* We find the government's administrative burden argument far less compelling. For starters, we know of no situation in our judicial system—civil or criminal—where administrative burden alone serves as a reason for denying the opposing party the benefit of an adversary proceeding. No doubt, criminal trials could be greatly simplified by allowing the prosecution to present its case to the jury unhampered by defendant's cross-examination and unburdened by his contradictory evidence. But that's just not how our system works. Adversary proceedings do in fact take more time, and they are more cumbersome, but with good reason: The adversary process helps us get at the truth.

Of course, the adversary process can be abused, resulting in protracted delay or in oppression of the opposing party or its attorney. But those are administrative concerns the district judge is well equipped to deal with. The scope of the proceeding, its duration, and the depth of inquiry are matters within the district judge's discretion. We would be surprised, however, if

these proceedings were to involve anything more elaborate than the prosecutor's articulation of his reasons, followed by the argument of defense counsel pointing out why the articulated reasons are factually unfounded or legally insufficient. *See United States v. Wilson*, 816 F.2d 421, 423 (8th Cir.1987); *United States v. Gordon*, 817 F.2d 1538, 1541–42 (11th Cir.1987); p. 1261 *infra*. But there is a fundamental difference between limiting the scope of a proceeding and dispensing with the adversary process altogether. In the latter case, defense counsel has absolutely no input into the judge's decision and is unable to make even the most obvious of arguments to refute or challenge the government's stated reasons. The need to avoid burdening already complex criminal proceedings with yet another procedural hurdle simply does not go that far.

*3.* We find the government's final argument the least persuasive, although it appears to have carried the day in another circuit. *Davis*, 809 F.2d at 1202. The notion that defense counsel can do nothing further to assist the court after he identifies the potential *Batson* violation simply does not square with reality. As we see it, defense counsel can perform two crucial functions in an adversary proceeding. The first is to point out to the district judge where the government's stated reason may indicate bad faith. For example, government counsel here excluded one of the jurors because he lived in defendant's neighborhood and wore jeans to court. *See* n. 1 *supra*. This seems like a legitimate reason, unless a nonexcluded juror also wore jeans or other casual dress, or lived in the same neighborhood as the defendant. The same would be true of the other reasons given: that a potential juror was a social worker, that another looked sullen or glared at the prosecutor, that yet another had acquitted a prior defendant. In each of those cases defense counsel might have been able to point out that the stated rea-

sons were pretextual because others similarly situated were allowed to serve.

In addition, defense counsel might have been able to argue that the reasons advanced by the prosecution were legally improper. Excluding jurors because of their profession, or because they acquitted in a prior case, or because of a poor attitude in answer to voir dire questions is wholly within the prosecutor's prerogative. *See United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir.1987) (poor attitude). Such reasons may not be logical, but that's what peremptory challenges are all about. They are often founded on nothing more than a trial lawyer's instinct about a prospective juror. The exercise of peremptory challenges, however, must withstand a *Batson* inquiry. Indeed, this case illustrates how apparent *Batson* error can result from an unclarified peremptory challenge. Here, the prosecutor excused a black potential juror because "he lived in the [defendants's] neighborhood—he's black, too, and he was dressed casually, and I thought he might identify with him too much...." *See* n. 1 *supra*. While part of this explanation might seem appropriately neutral, the fact that the potential juror might identify too much with the defendant because they are of the same race is precisely what *Batson* said was not legitimate. *Batson*, 106 S.Ct. at 1723. Because the prosecutor's reasons were left unchallenged, she was unable to explain further her reasoning and perhaps dispel the inference that she acted from improper motives.

Of course, the district judge might be able to detect some of these deficiencies by himself, but that is not his normal role under our system of justice. He would have to take on the role of defense counsel—inventing possible arguments as to why the prosecutor's stated reasons might not be sufficient—while at the same time keeping an open mind so as to rule on the motion impartially.[4] And, with all appropriate respect for our able district judges, there might be arguments they would over-

---

4. At least as to some matters, the court simply might not have the time to ferret out the facts. For example, the judge may not know the defendant's neighborhood, and would require some research as to whether any other potential juror's address was within it. Defense counsel, on the other hand, with the aid of the defendant, would be able to resolve such matters quite easily.

look if unassisted by an advocate. That, at least, is one of the theories behind our adversary system.

The second function defense counsel can perform is to preserve for the record, and possible appeal, crucial facts bearing on the judge's decision. This is a case in point. All we have before us concerning this issue is the prosecutor's explanation of her reasons and the district judge's ruling. For all we know, however, every one of the jurors picked might have worn jeans or voted to acquit a prior defendant. Our trust in the learned district judge does, of course, make us quite certain that this could not have been the case. However, if we are to review the district judge's decision, we cannot affirm simply because we are confident he must have known what he was doing. We can only serve our function when the record is clear as to the relevant facts, or when defense counsel fails to point out any such facts after learning of the prosecutor's reasons.

Here, the record's silence cannot be reassuring. The district judge may well have overruled the defendant's objection because he saw no discrepancies in any of the explanations given by the prosecutor; or he might have seen some discrepancies, but deemed them irrelevant or insufficient. In the former case, we would be constrained to sustain his judgment, but not necessarily in the latter. Since defense counsel did not learn of the prosecutor's reason until long after the trial, the fact that he failed to point out any discrepancies cannot give us the confidence we would normally have when the record is mute.

In short, we respectfully disagree with the view that defense counsel has nothing to add once he has pointed out the potential *Batson* violation and hope the Sixth Circuit will have occasion to reexamine its position. Defense counsel could say things that might persuade the district judge or, failing that, he could say things that might persuade us. Both functions are crucial to our adversary system and to the principles

of due process it serves. We therefore conclude that the district court erred in refusing to allow defense counsel in this case to hear the government's reasons for excluding the black potential jurors and to present argument thereon.

## C. Harmless Error

■ The government makes two separate arguments that such error as may have occurred was harmless. First, it suggests that the transcript containing the prosecutor's explanation shows she did not exclude blacks from the jury because of their race, thereby proving that failure to follow the proper procedure did not prejudice defendant. But the very reason we hold the procedure to have been deficient is that, without defense counsel's participation, the transcript is likely to be incomplete or misleading, as it is in this case. The government cannot rely on a transcript reflecting such fundamentally flawed procedures to show that that defendant suffered no prejudice.

The government also argues that, even assuming the prosecutor made discriminatory use of her peremptory challenges, it was harmless error because Thompson is so obviously guilty of the crimes he was charged with. Moreover, the defense made no effort to show that the *jury* was biased against blacks, and Thompson's codefendant, a black man, was acquitted.

Nevertheless, we cannot find this to be harmless error. Just last year the Supreme Court held that racial discrimination in the selection of grand jurors was not harmless error, despite a subsequent guilty verdict from an unbiased petit jury. *Vasquez v. Hillery*, 474 U.S. 254, 261–63, 106 S.Ct. 617, 622–23, 88 L.Ed.2d 598 (1986). Four members of the Court also intimated that where a petit jury is selected using improper criteria the error could not be harmless. *See id.*, 106 S.Ct. at 623–24 (plurality opinion) (citing *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976) (per curiam)).[5]

---

5. This is an exception to the general rule for constitutional violations. *See, e.g., Chapman v. California*, 386 U.S. 18, 21–24, 87 S.Ct. 824, 826–828, 17 L.Ed.2d 705 (1967) (improper comment on failure to testify may be harmless er-

ror); *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969) (use of co-conspirator's statement in violation of confrontation clause may be harmless error); *Coleman v. Alabama*, 399 U.S. 1, 11, 90 S.Ct. 1999,

### Conclusion

We remand for a hearing, in accordance with the procedure outlined in this opinion, on the prosecution's motive in exercising its peremptory challenges. If the district court finds that the passage of time has rendered such a hearing meaningless, it shall vacate defendant's convictions and schedule a new trial.

SNEED, Circuit Judge, dissenting:

In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Justice Powell said: .

> We decline, however, to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges.

*Id.* at 1724. In this case the majority has formulated such a procedure for this circuit. Its procedure is to require an adversary proceeding in which not only must the defendant's counsel establish a prima facie case by *Batson* error, but also the prosecution's "neutral explanation for challenging black jurors" must be presented and defended. The majority prefers this procedure to the *in camera* proceedings employed in this case, at least in part, because of the adversarial nature of our criminal justice system. The majority of the Supreme Court in *Batson* apparently did not recognize the compelling force of this characteristic.

Nor do I. My view is based on these considerations. First, contrary to the majority's assertion, defense counsel's utility after having established a prima facie case of *Batson* error would be quite limited. Principally it would consist of attempting to establish that the neutral explanations were false. This could be done only by showing that the facts set forth in neutral explanations were incorrect *and* that there was a pattern of these "mistakes." For example, to show that Cynthia King was not a social worker, but rather was a secretary, would not establish *Batson* error. *See ante,* at 1256 n. 1. Alone it only indicates a wasted peremptory challenge. Only by also showing that Annie McMullen

had the countenance of an angel and that Carlos Davis did not in fact sit on a jury that acquitted would an inference of *Batson* error arise. This pattern of "mistakes" and the somewhat ambiguous explanation of Marvin Young's challenge would no doubt strongly suggest *Batson* error.

While I concede that a showing such as described could be facilitated by the presence of defense counsel, buttressed by ample investigation, I am by no means confident that it frequently would be. Indeed, it appears to me that defense counsel's principal contribution in a *Batson* adversary hearing would be to charge, but not prove, incorrect assumptions by the prosecuting attorney and thus improper motions, while gleaning as much as possible about the prosecution's trial strategy. A mere charge of improper motives may be entitled to more weight than a mere denial of such motives, which under *Batson* is entitled to no weight, 106 S.Ct. at 1723, but . it is doubtful that the excess is great.

This leads me to my second point. Assume for the moment that my estimate of defense counsel's contribution to the *Batson* error search is too low. Is there any reason not to leave to the district court the decision whether the hearing should be *in camera* as in this case or adversarial as the majority would have it? The majority extols the wisdom of district judges in its prelude to its denial of their ability to determine which type of hearing would be proper. This denial is not comprehensive, however. Even the majority would permit an *in camera* hearing when the prosecutor claims that his reason relates to case strategy. In one sense all peremptory strikes relate to case strategy, but even if the majority has a narrower concept in mind, its concession is significant. Try as it might to eliminate trial court discretion, it was turned to by the majority to rescue it from the most troublesome aspect of its position. Grace would be better served if it were acknowledged that, with respect to *Batson* error, the trial court should determine whether, following the establishment

---

2004, 26 L.Ed.2d 387 (1970) (denial of counsel); *Strickland v. Washington,* 466 U.S. 668, 691, 104

S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984) (ineffective assistance of counsel).

of the prima facie case by the defendant, its procedure should be wholly adversarial, wholly *in camera,* or a bit of both. This is true because, stripped of its rhetoric, the majority opinion tolerates each of these procedures.

Recognizing the trial court's discretion as I suggest would substantially contribute to reducing the administrative burden that the majority asserts is the inescapable price of the adversary system of criminal justice. District judges appreciate the constitutional significance of the adversary system quite as much as appellate judges, and I am confident they can be trusted to use it when needed in the search for *Batson* error. When not needed it can be put aside in the interest of expediting the administration of justice. It must be remembered that, in any event, the trial court's finding with respect to purposeful discrimination is a finding of fact which can be set aside only when clearly erroneous. *Batson,* 106 S.Ct. at 1724 n. 1.

Let me be more specific by addressing the neutral explanations offered by the prosecutor in this case. I cannot believe that a peremptory challenge based on the "glaring" by a potential juror suggests *Batson* error. *See United States v. Vaccaro,* 816 F.2d 443, 457 (9th Cir.1987) (prosecutor's use of challenge to strike juror with "poor attitude" held proper). It does not amount to a mere assertion of good faith. *See Batson,* 106 S.Ct. at 1723. Surely in the California of 1987 we have moved beyond the intense racism of earlier times and other places that possibly would justify the belief that a strike based on the glare of a prospective juror amounted to a challenge on the basis of race. The Marvin Young challenge more closely approaches *Batson* error than any other. Even it, however, does so only because the prosecutor mentioned race. I read that reference as being in support of the assertion that Marvin Young and the defendant were neighbors. Apparently the district court did also. Finally, even the majority can find no flaw in the Cynthia King and Carlos Davis challenges.

The findings in this case, thus, are not clearly erroneous to my way of thinking. The majority, in justifying its emphasis on an adversary hearing, sprinkles the dust of doubt over the prosecutor's explanations. It suggests that the prosecutor could have dispelled this doubt had there been an adversary hearing. *See ante,* at 1260–1261. There was no need to dispel such doubt. The prosecutor convinced the factfinder. To avoid facing the question whether the trial court's findings were clearly erroneous, the majority erects a constitutional requirement, not imposed by *Batson,* that it asserts better would enable it and the trial court to determine whether the prosecutor acted with an improper motive. Neither the trial court nor I require such assistance.

Finally, it must be recognized that *Batson,* presumably, is not limited to peremptory challenge to blacks on the venire when the defendant is black. No doubt other groups, Asians, Hispanics, etc., are entitled to similar protection. Already there exist suggestions that *Batson* protection might be extended beyond race. *See Brown v. North Carolina,* —— U.S. ——, 107 S.Ct. 423, 424, 93 L.Ed.2d 373 (1986) (Brennan, J., dissenting from denial of certiorari). The procedure required to respond to *Batson* challenges must remain not unduly burdensome. Should, as the majority makes more likely, it become encumbered with time-consuming hearings, it would be far better to eliminate peremptory challenges by the prosecution as Justice Marshall in *Batson* suggested.[1] *See* 106 S.Ct. at 1726–30 (Marshall, J., concurring). This would be true even if it somewhat impaired prosecutorial power. This impairment would be preferable to the costs elaborate *Batson* litigation will impose. Sometimes it is wiser to develop rules that eliminate issues subject to adjudication, particularly when as in this case the costs of doing so can be diffused throughout the society, than it is to provide exquisitely for their determination. The majority, perhaps, are nudging us toward that resolution of the

---

**1.** Peremptory challenges by the defense based    on racial grounds raise different issues.

*Batson* issue. For the moment, at least, I am resisting that nudge.