**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

CLEMENTE HERNANDEZ-GARCIA,
*Defendant-Appellant.*

No. 20-50228

D.C. No.
3:19-cr-04373-GPC-1

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Argued and Submitted February 10, 2022
Pasadena, California

Filed May 4, 2022
Amended August 17, 2022

Before: Mary M. Schroeder, Kermit V. Lipez,[*] and
Kenneth K. Lee, Circuit Judges.

Order;
Opinion by Judge Lee

---

[*] The Honorable Kermit V. Lipez, United States Circuit Judge for
the First Circuit, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel filed (1) an order denying a petition for panel rehearing and denying on behalf of the court a petition for rehearing en banc, and (2) an opinion that amends a May 4, 2022, opinion affirming a conviction for illegal reentry after removal, in a case in which a Marine Corps surveillance unit spotted the defendant immediately after he unlawfully entered the United States, and notified Customs and Border Patrol agents who soon detained him.

The defendant argued that the Marine Corps surveillance violated the Posse Comitatus Act, which codified the longstanding prohibition against military enforcement of civilian law. Rejecting that argument, the panel explained that the military may still assist civilian law enforcement agencies if Congress expressly authorized it, and here, the 2016 National Defense Authorization Act directed the U.S. Secretary of Defense to offer military assistance to Border Patrol in hopes of securing the southern land border. The panel concluded that the district court therefore properly denied the defendant's suppression motion based on the alleged violation of the Posse Comitatus Act.

The panel also denied the defendant's *Batson* challenge to the prosecution's striking two Asian jurors from the venire, concluding that the defendant failed to rebut the prosecution's race-neutral reasons for doing so.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Kara Hartzler (argued), Federal Defenders of San Diego Inc., San Diego, California, for Defendant-Appellant.

Daniel E. Zipp (argued), Assistant United States Attorney; Randy S. Grossman, Acting United States Attorney; United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

**ORDER**

The panel voted to deny the petition for panel rehearing. Judges Lee and Schroeder voted to deny the petition for rehearing en banc, and Judge Lipez recommended denying the petition for rehearing en banc. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. The petition for panel rehearing and rehearing en banc (Dkt. No. 47) is **DENIED**. No future petitions for rehearing or rehearing en banc will be entertained.

The Clerk shall file the opinion submitted with this order that amends the opinion submitted on May 4, 2022 (Dkt. No. 44).

**OPINION**

LEE, Circuit Judge:

Near the midnight hour in a remote area along the California-Mexico border, Clemente Hernandez-Garcia

scaled a border fence and unlawfully entered the United States. But he could not evade detection even under the cover of darkness and desolation near the border: A Marine Corps surveillance unit using a night vision scope spotted him immediately. The Marines notified U.S. Customs and Border Patrol agents, who soon detained him. He was charged and convicted of illegal reentry into the United States after removal.

Hernandez-Garcia now seeks to reverse his conviction, arguing that the Marine Corps surveillance allegedly violated the Posse Comitatus Act. That law codified the longstanding prohibition against military enforcement of civilian law. But the military may still assist civilian law enforcement agencies if Congress expressly authorizes it. Here, the 2016 National Defense Authorization Act directed the U.S. Secretary of Defense to offer military assistance to Border Patrol in hopes of securing the southern land border.

We thus reject Hernandez-Garcia's claim that the U.S. Marines' surveillance at the border violated the Posse Comitatus Act. We also deny Hernandez-Garcia's *Batson* challenge because he failed to rebut the prosecution's race-neutral reasons for striking two Asian jurors. We affirm Hernandez-Garcia's conviction.

## BACKGROUND

### I.   Border Patrol detains Hernandez-Garcia just north of the southern border, and he is charged with illegal reentry after removal.

Clemente Hernandez-Garcia has racked up a long record of immigration violations and criminal convictions. Since first illegally entering the United States in 1994, Hernandez-Garcia has been removed seven times after being convicted

of drug and firearm offenses, burglary, vehicle theft, and aggravated domestic violence.  Most recently in 2019, he was removed to Mexico after being released from prison for his latest criminal conviction.

Hernandez-Garcia waited only ten days before unlawfully reentering the United States yet again.  Late at night, he climbed over the border fence in a remote area 25 miles east of Tecate, California, the nearest port of entry in southeastern San Diego County.  But a Marine Corps unit using a scope truck equipped with infrared night vision spotted him.  The Marines alerted nearby Border Patrol agents that an individual was 10–15 feet north of the border fence near an area known as Mercado Rock.

Border Patrol Agent Allen-Limon responded to the alert and began searching the area.  Shortly after the search began, a separate Border Patrol surveillance unit notified him of an individual running across a nearby highway.  Allen-Limon combed the area near the highway and eventually found Hernandez-Garcia hiding face-down in a dried riverbed.  He ordered Hernandez-Garcia to come out from hiding and questioned him.  Hernandez-Garcia admitted he was a Mexican citizen and lacked proper immigration documents.  In a later post-*Miranda* interview, he admitted to crossing the border by jumping the fence.  He was then charged with illegal reentry after removal in violation of 8 U.S.C. § 1326.

## II. Hernandez-Garcia files a suppression motion based on alleged violations of the Posse Comitatus Act but the motion is denied.

Hernandez-Garcia moved to suppress all evidence obtained as a result of his arrest, claiming that the Marine Corps surveillance leading to his arrest violated the Posse

Comitatus Act, 18 U.S.C. § 1385.[1]    That law broadly prohibits the military from directly enforcing civilian law unless authorized by Congress to do so.  *See id.*; 10 U.S.C. § 275.  The government maintained that Congress expressly authorized the Marine surveillance when it enacted the National Defense Authorization Act for Fiscal Year 2016, Pub. L. No. 114-92, 129 Stat. 726 (2015) ("2016 NDAA"). Section 1059 of the 2016 NDAA authorized the Secretary of Defense to aid Border Patrol by deploying "ground-based surveillance systems to support continuous surveillance of the southern land border of the United States."  *Id.* § 1059(c)(2).    But Hernandez-Garcia countered that the 2016 NDAA was merely an annual appropriations bill that had lapsed.

The district court denied Hernandez-Garcia's motion. The district court held that the 2016 NDAA was an authorization act, not an appropriations act, and thus was still effective when the government detained Hernandez-Garcia. And because § 1059 authorized the Marine surveillance, no Posse Comitatus Act violation occurred.    The case proceeded to trial.

### III.    Hernandez-Garcia unsuccessfully raises a *Batson* challenge after the prosecution strikes Asian jurors.

At the outset of voir dire, each juror read aloud answers to a questionnaire about their city of residence, family information, vocation, prior jury service, and involvement

---

[1] Hernandez-Garcia also argued that he was arrested without probable cause.  The district court held that the Border Patrol agents had probable cause, and Hernandez-Garcia does not challenge this ruling on appeal.

with law enforcement or the military. Hernandez-Garcia raised a *Batson* challenge, claiming that the government improperly excluded two Asian jurors, Jocelyn Del Rosario and Brian Sanqui. *Batson v. Kentucky*, 476 U.S. 79 (1986). Ms. Del Rosario provided the following answer:

> My name is Jocelyn Del Rosario, and I reside in San Diego, I am a research scientist for Bristol Myers Squibb. And I am not married and I have no children. I did preside in a civil and a criminal case about 20 years ago. The criminal case ended in a hung jury, and the civil case reached a verdict. My family members are not in the law enforcement. And I have not served in the military.

Mr. Sanqui then provided his answer:

> My name is Brian Sanqui. I reside in Poway. I am a software developer. I do not have a spouse or children. I have never served on a jury previously. I do not work in law enforcement, and I do not have any family members who work in law enforcement. And I have never served in the military.

After the jurors read their answers aloud, each side conducted voir dire. The prosecution noted that there were "a lot of . . . engineers here" and that "[e]ngineering is a profession where you are often used to dealing with hard numbers, objective facts." Because its case relied on circumstantial evidence, the prosecution asked whether any of the jurors would struggle to convict if it proved its case solely based on such evidence. One juror at first expressed

doubt, but after more questioning, stated that he could "make [his] mind up based on evidence provided like that."

Following voir dire, the government exercised two of its seven peremptory challenges against Ms. Del Rosario and Mr. Sanqui. When the court asked whether the defense had any *Batson* issues, Hernandez-Garcia's counsel noted that the prosecution had used three of its strikes on "jurors who appear to be Asian or have last names that would so indicate,"[2] and that there were "four or five Asian jurors in the venire." So striking three out of four or five Asian jurors supported an inference of purposeful discrimination, according to Hernandez-Garcia.

The prosecution then stated its reasons for striking Ms. Del Rosario and Mr. Sanqui. The prosecution struck Ms. Del Rosario because she "was on a jury with a hung verdict" and she was a "research scientist." The prosecutor struck Mr. Sanqui because:

> [H]e appeared to be a loner. The only thing he said during the inquiry was, "I am a software developer, no spouse, no kids." He came dressed in a hoodie, which we perceived to be underdressed, and that gave us some concern that, based on his profession and lack of comments – that was the basis for striking him.

---

[2] The prosecution struck a third Asian juror, Ms. Ahmad, because (1) Border Patrol had once searched her, and (2) she had served as a witness in an immigration case that left her with a "negative impression" of Border Patrol agents. The district court held that these reasons were legitimate, and Hernandez-Garcia does not raise a *Batson* challenge for the striking of Ms. Ahmad.

The district court denied the *Batson* challenge, stating that it was "not prepared to find that there's a prima facie case that's been established."  It then restated the prosecution's proffered reasons but did so somewhat inaccurately.  For Ms. Del Rosario, the court said, "single, no children, served on a jury where there was a hung jury on a criminal case—the Court is satisfied that that's a valid explanation for the strike."  But Ms. Del Rosario's marriage status and lack of children were not cited by the prosecution. For Mr. Sanqui, the court said, "single, no children, no jury experience—it appears that there's no illegitimate basis that was used."  The prosecution, however, did not strike Mr. Sanqui for lack of jury experience.

Defense counsel requested that the court conduct a "comparative juror analysis" for Ms. Del Rosario and Mr. Sanqui because "there are multiple jurors who said they had been on juries that did not reach verdicts" and the rationale of "single with no kids" was concerning because there were "multiple jurors who said that" including white jurors.  But the court responded that the "challenge is denied."  Hernandez-Garcia's counsel then asked, "[I]s the Court making a finding there is no purposeful discrimination?"  The district court replied, "I have made a finding there's not a prima facie case.  There's not discrimination."

## IV.    The jury convicts Hernandez-Garcia and he appeals.

The jury convicted Hernandez-Garcia of illegal reentry after removal.  He then filed this appeal, raising two issues. First, he renews his argument that the Marine Corps surveillance violated the Posse Comitatus Act.  Second, he claims that the district court erred in conducting the *Batson* inquiry.  He asks that we review de novo the record and hold

that the prosecution racially discriminated against Asian jurors, or, at the very least, remand for the district court to conduct more analysis at *Batson*'s third step.

## STANDARD OF REVIEW

We review de novo whether the Marine surveillance violated the Posse Comitatus Act. *United States v. Dreyer*, 804 F.3d 1266, 1271 (9th Cir. 2015) (en banc). "Ordinarily, we review the district court's ruling on a *Batson* challenge for clear error." *United States v. Mikhel*, 889 F.3d 1003, 1028 (9th Cir. 2018). "However, we review *de novo* whether the district court properly applied *Batson*," *United States v. Alvarez-Ulloa*, 784 F.3d 558, 565 (9th Cir. 2015), and we "have applied de novo review [to the court's *Batson* ruling] . . . where the court improperly applied the three-step framework," *Mikhel*, 889 F.3d at 1028.

## DISCUSSION

## I. The district court properly denied Hernandez-Garcia's suppression motion because the 2016 NDAA authorizes the Marine Corps surveillance.

After Reconstruction, Congress enacted the Posse Comitatus Act to "eliminate the direct active use of Federal troops by civil law authorities." *United States v. Banks*, 539 F.2d 14, 16 (9th Cir. 1976). Under the current version of the law, military personnel cannot assist in civilian law enforcement unless expressly authorized by Congress:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army, the Navy, the Marine Corps, the Air Force, or the Space

> Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385.

Here, the Posse Comitatus Act posed no obstacle to the U.S. Marines assistance because Section 1059 of the 2016 NDAA expressly authorizes surveillance by the military at the southern border. Section 1059(a) directs the Secretary of Defense to "provide assistance to [Border Patrol] for purposes of increasing ongoing efforts to secure the southern land border of the United States." 2016 NDAA § 1059(a). The military may deploy "ground-based surveillance systems to support continuous surveillance of the southern land border of the United States." *Id.* § 1059(c)(2). And that is exactly happened here.

Despite § 1059's directive, Hernandez-Garcia maintains that the Marine Corps surveillance leading to his arrest was unauthorized. He again claims that the 2016 NDAA was a lapsed appropriations act no longer in effect at the time of his arrest. We reject that argument. Section 1059 of the 2016 NDAA remains in force. In last year's 2021 NDAA, Congress made minor amendments to § 1059's congressional reporting requirements, confirming that the law remains in effect. *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. 116-283, 134 Stat. 3388 (2021). Congress would have no reason to amend § 1059 if it was a lapsed appropriations act. The 2021 NDAA thus provides explicit evidence that § 1059 continues in full effect. *See McClure v. United States*, 95 F.2d 744, 750 (9th Cir. 1938) ("Where an amendment leaves certain portions of the original act

unchanged, such portions are continued in force with the same meaning."); *see also United States v. Rios-Montano*, 438 F. Supp. 3d 1149, 1153 (S.D. Cal. 2020) ("Congress has also made substantive changes to the law and enacted new, longstanding programs through other NDAAs.").

Further, § 1059—unlike other provisions in the 2016 NDAA—has no termination date, confirming that Congress intended § 1059 to remain operative beyond fiscal year 2016. *See Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015) ("Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another.").

Hernandez-Garcia also argues that an earlier statute, 10 U.S.C. § 274, defines the scope of Congressionally authorized military border surveillance, and that the surveillance here exceeds that prior limit. Section 274 permits Department of Defense personnel to be "made available to a civilian law enforcement agency" to "operate equipment" for the:

> Detection, monitoring, and communication of the movement of surface traffic outside of the geographic boundary of the United States and within the United States not to exceed 25 miles of the boundary *if the initial detection occurred outside of the boundary*.

10 U.S.C. § 274(b)(2) (emphasis added). According to Hernandez-Garcia, because the Marines "initially detected" him 10–15 feet *inside* the United States, they exceeded their authority under § 274's limitation of detection "*outside*" of the United States border.

Put another way, he argues that the previously enacted § 274 trumps § 1059 of the NDAA, invoking the "general-specific" canon. *See Hellon & Assocs., Inc. v. Phoenix Resort Corp.*, 958 F.2d 295, 297 (9th Cir. 1992). Under this canon of construction, "the later and more specific statute usually controls" if two statutes conflict. *Id.* "[L]egislators are often . . . unfamiliar with enactments of their predecessors" and may "unwittingly contradict them." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 185 (2012). Thus, if the newer statute "comes closer to addressing the very problem posed by the case at hand," it is as if the "later-enacted statute . . . effectively repeal[ed]" the conflicting provisions of the earlier one. *Id.* at 183–85.

According to Hernandez-Garcia, § 1059 and § 274 conflict because the former permits surveillance of individuals no matter where the initial detection occurred, while the latter requires the initial detection to occur outside the United States. And § 274 is supposedly more specific because it allows the military to surveil "with respect to . . . a criminal violation," while § 1059 is silent about criminal violations. *Compare* 10 U.S.C. § 274(b)(1)(A), *with* 2016 NDAA § 1059.

We agree that the two statutes conflict because of § 274's "initial detection" limitation. But the general-specific canon cuts against Hernandez-Garcia's position. The 2016 NDAA's § 1059 is in fact more specific than § 274 as applied here, so § 1059 takes precedence over § 274. First, while § 274 contains only general language about "detection" and "monitoring," § 1059 specifically authorizes the Marine Corps to surveil the California-Mexico border from a scoping truck. Second, while § 274 generally permits assistance to any "Federal, State, and local civilian law

enforcement officials," § 1059 authorizes the military to assist only a single federal agency, Customs and Border Patrol.    Third, § 274 allows general surveillance of any United States boundary, while § 1059 approves surveillance of only the "southern land border."   Finally, § 274 broadly allows the operation of "equipment," while § 1059 specifically directs the deployment of "ground-based surveillance systems" such as scoping trucks.   *Compare* 10 U.S.C. § 274(a)–(b), *with* 2016 NDAA § 1059(a) and (c).[3]   Thus, we hold that the 2016 NDAA's § 1059 is more specific than—and thus trumps—the general provisions in § 274.

We also reject Hernandez-Garcia's contention that applying § 1059 here would render § 274 superfluous.   *See D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932) ("[I]f possible, effect shall be given to every clause and part of a statute.").   Section 274's "initial detection" limitation would still apply if the military were surveilling other United States boundaries (*i.e.*, the non-Southern border) or aiding other law enforcement agencies (*i.e.*, non-Border Patrol agencies).   *See* Scalia & Garner, *supra* at 185 ("The specific provision does not negate the general one

---

[3] In any event, the specificity in § 274 that Hernandez-Garcia seizes upon—assistance with criminal violations—has little relevance here. *See* 10 U.S.C. § 274(b)(1)(A).   The government's decision to criminally charge Hernandez-Garcia with illegal reentry is separate from the critical issue here: whether Congress authorized Marine Corps surveillance that enabled Border Patrol to locate him.   And even if § 274's specificity about criminal violations was relevant, Hernandez-Garcia's reliance on the "general-specific" canon would still be misplaced because then both statutes would be "specific in certain respects and general in others," so "the general-specific canon [would] not help to *clearly* discern Congress's intent as to which section should take precedence here." *See Perez-Guzman v. Lynch*, 835 F.3d 1066, 1075–76 (9th Cir. 2016) (emphasis in original).

entirely, but only in its application to the situation that the specific provision covers."). Congress passed § 1059 to explicitly address acute security issues amid the surge of migrants at the southern border. In doing do, Congress was not hamstrung by § 274's constraints. *See United States v. Juvenile Male*, 670 F.3d 999, 1007–08 (9th Cir. 2012) (holding earlier statute prohibiting identification of juvenile delinquents does not prevent application of a later statute specifically requiring juvenile sex offenders to join a registry).[4]

We thus hold that § 1059 of the 2016 NDAA authorized the Marine Corps' surveillance of Hernandez-Garcia at the southern border, and that the district court rightly denied his suppression motion based on the alleged violation of the Posse Comitatus Act.[5]

## II. We deny Hernandez-Garcia's *Batson* challenge because he has failed to show that the prosecution purposefully discriminated against Asian jurors.

*Batson v. Kentucky* established a three-step burden-shifting framework for evaluating a defendant's claim that the prosecution exercised peremptory strikes in a racially discriminatory manner. *See Hernandez v. New York*,

---

[4] While the parties have not raised it, 10 U.S.C. § 284(b)(6) allows the Secretary of Defense to provide support for "detection" and monitoring" outside the U.S. border to combat "counterdrug activities" and "transnational organized crime." It does not apply here because of its limitation to certain criminal activities.

[5] Because we hold that the 2016 NDAA authorized the Marines' surveillance, we do not address the government's argument that it amounted to only indirect assistance not subject to the Posse Comitatus Act.

500 U.S. 352, 358–59 (1991). The defendant must first make a prima facie showing that the prosecution exercised its strikes based on race. *Id.* at 358. Then, the burden shifts to the prosecution to provide a "race-neutral explanation for striking the jurors in question." *Id.* at 359. If the prosecution provides race-neutral reasons, the district court must determine based on the record whether the "defendant has carried his burden in proving purposeful discrimination." *Id.*

Because the prosecution offered race-neutral reasons for striking Ms. Del Rosario and Mr. Sanqui, the only remaining inquiry is whether the district court erred at step three. *See Mikhel*, 889 F.3d at 1029. While we normally review a district court's step three finding for clear error, we have sometimes applied de novo review when the district court's analysis was deficient, either because the court did not engage in a meaningful analysis or failed altogether to conduct a step three *Batson* assessment. *See, e.g.*, *Alvarez-Ulloa*, 784 F.3d at 565 (failing to reach step three); *United States v. Alanis*, 335 F.3d 965, 968–69 (9th Cir. 2003) (failing to conduct meaningful analysis at step three).

Hernandez-Garcia insists that the district court's analysis was flawed and urges us to conduct our own de novo review at step three. First, Hernandez-Garcia argues that the district court failed to conduct a step three analysis because, after listening to the prosecution's race-neutral reasons, the district court twice stated that there is not "a prima facie case," seemingly making a step one finding. Even if the district court reached step three, its analysis was not meaningful, according to Hernandez-Garcia, because the district court misstated the prosecution's proffered reasons for striking Ms. Del Rosario and Mr. Sanqui.

We acknowledge that the district court's oral *Batson* ruling is not a paragon of clarity. But when reviewing a

district court's oral pronouncements in court, we must be careful "not to formally parse the sentences contained in a transcript of an oral ruling or to demand absolute linguistic precision from the trial judge." *See United States v. Coutchavlis*, 260 F.3d 1149, 1156 (9th Cir. 2001). And even indulging Hernandez-Garcia's request that we apply de novo review, we conclude that Hernandez-Garcia did not prove that the prosecution purposefully discriminated against Asian jurors.[6]

The "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). The "critical question" in determining whether Hernandez-Garcia has proven "purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El v. Cockrell*, 537 U.S. 322, 338–39 (2003). At step three, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* at 339 (quoting *Purkett*, 514 U.S. at 768). But a "legitimate reason" is not necessarily a "reason that makes sense," but is instead "a reason that does not deny equal protection." *Purkett*, 514 U.S. at 768–69.[7] Ultimately, we must determine whether the "stated

---

[6] We do not hold that the district court's analysis was erroneous such that de novo review is required. Rather, we assume without deciding that the district court erred because Hernandez-Garcia's *Batson* claim still fails under de novo review.

[7] There is no requirement, as Hernandez-Garcia urges, that the prosecution's reasons be directly relevant to *the crime charged*. *Purkett* clarifies that *Batson's* warning that the prosecution's reasons must be "related to a particular case to be tried" was "meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive." *See id.*; *see also Kesser*

reasons were the prosecutor's genuine reasons for exercising a peremptory strike." *Green v. LaMarque*, 532 F.3d 1028, 1030 (9th Cir. 2008).

The prosecution struck Ms. Del Rosario because she served on a hung jury and works as a research scientist. Ms. Del Rosario's prior service on a hung jury was a legitimate reason. *See United States v. Rudas*, 905 F.2d 38, 41 (2d Cir. 1990). And it was permissible to strike Ms. Del Rosario based on her occupation because the prosecution stated "a genuine, race-neutral reason for believing that the occupation would make the juror unfavorable." *Jamerson v. Runnels*, 713 F.3d 1218, 1235 (9th Cir. 2013). During voir dire, the prosecution expressed concern that jurors with engineering backgrounds, who are used to dealing with "hard numbers, objective facts," would be skeptical of the government's case built on circumstantial evidence. It was reasonable for the prosecution to be concerned that Ms. Del Rosario, a research scientist, also possessed this same distrust of circumstantial evidence.

Still, Hernandez-Garcia maintains that the reasons were pretextual because the prosecution failed to strike four white jurors who had also allegedly served on hung juries. But none of the white jurors were researchers or worked in a related field. (Mr. Avecilla: "I am a default assistant at [a] law firm."); (Mr. Hogan: "I am retired."); (Mr. Westfall: "I am a retired CPA and finance manager."); (Mr. Brownlow: "I am a construction consultant, a former teacher."). As we

---

*v. Cambra*, 465 F.3d 351, 364 (9th Cir. 2006) (en banc) (noting that the prosecutor's "[r]easons must be related to *the particular case* to be tried," and that "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination") (emphasis added) (cleaned up).

just explained, Ms. Del Rosario's scientific background is a persuasive reason for striking her. *See United States v. Lewis*, 837 F.2d 415, 417 n.5 (9th Cir. 1988) (noting that "the decision whether to strike a venireman hinges upon the interplay of various factors"). We thus conclude that Hernandez-Garcia did not show that the prosecution purposefully discriminated against Ms. Del Rosario.[8]

We also hold that Hernandez-Garcia failed to prove that the prosecution struck Mr. Sanqui for racially discriminatory reasons. The prosecution struck Mr. Sanqui because "he appeared to be a loner" as the "only thing he said during [voir dire] was 'I am a software developer, no spouse, no kids.'"[9] Mr. Sanqui also "came dressed in a hoodie," which the prosecution "perceived to be underdressed."

Striking a perceived "loner" is permissible because "a loner may hamper the jury's ability to reach a unanimous verdict." *United States v. Daly*, 974 F.2d 1215, 1219 (9th Cir. 1992). And the prosecution may legitimately strike a juror based on his casual dress because it conveys a possible lack of enthusiasm for jury service. *See United States v.*

---

[8] Hernandez-Garcia faults the district court for not conducting a comparative juror analysis at step three. But our own de novo comparative analysis demonstrates that, if error occurred, it was harmless.

[9] Hernandez-Garcia interprets the prosecution's reference to Mr. Sanqui's profession as an independent reason for its challenge and urges us to conduct a comparative juror analysis with respect to other jurors sharing the same occupation. But the prosecution did not strike Mr. Sanqui because of his profession. Rather, it struck Mr. Sanqui because of his brief response, and in explaining its thinking to the court, the prosecution incidentally repeated Mr. Sanqui's reference to his profession. Thus, we decline to conduct a comparative juror analysis as to occupation.

*Thompson*, 827 F.2d 1254, 1260 (9th Cir. 1987).    We recognize that these reasons are subjective and largely based on a prosecutor's "instinct about a prospective juror."  *Id.* But reliance on instinct is permissible and "wholly within the prosecutor's prerogative."  *Id.*

Hernandez-Garcia quarrels with the prosecution's assumption that Mr. Sanqui's brief response suggests he is a loner.   According to Hernandez-Garcia, Mr. Sanqui's 58-word response was longer than at least six non-Asian jurors whom the prosecution did not strike, so the loner explanation must be pretextual.    We disagree.    The prosecution's conclusion about a juror's demeanor is often based on a "hunch."  *See Burks v. Borg*, 27 F.3d 1424, 1429 n.3 (9th Cir. 1994).   The veracity of such an inherently subjective perception cannot be doubted based solely on a word count.

Lastly, Hernandez-Garcia argues that our decision in *Ali v. Hickman*, 584 F.3d 1174 (9th Cir. 2009), prohibits reliance on Mr. Sanqui's casual dress.    In *Ali*, we considered "casualness" an "exceedingly weak" justification because it was contradicted by the prosecution's other reason that the juror "would 'over-intellectualize' the decisionmaking process."  *Id.* at 1195.  But here, there is no conflict between the prosecution's loner and casualness rationales.    If anything, the two reasons reinforce one another because they both suggest that Mr. Sanqui has low enthusiasm for jury service and may hinder a unanimous verdict.    And Hernandez-Garcia has failed to identify a single similarly dressed non-Asian juror who went unchallenged.   *See Thompson*, 827 F.2d at 1260 (Casual dress is a "legitimate reason, unless a nonexcluded juror also wore jeans or other casual dress.").

**CONCLUSION**

We hold that the Marine Corps did not violate the Posse Comitatus Act by surveilling Hernandez-Garcia just north of the southern border.  We also hold that Hernandez-Garcia failed to prove that the prosecution racially discriminated by striking two Asian jurors from the venire.  We **AFFIRM** Hernandez-Garcia's conviction.